This is In Re. Teladoc. Ms. Ormsby, am I pronouncing that right? You are. Thank you. All right. So you have reserved two minutes for rebuttal, so that gives you eight to begin. You may proceed. Perfect. Thank you so much. May it please the Court, I'm Lauren Ormsby from Labaton Keller Cisharo for Lead Plaintiff's Appellants. This Court should, once again, reverse the dismissal of Plaintiff's Securities Class Action Complaint under NOVA Review. This Court, in a unanimous summary order by Judges Bianco, Perez, and Nathan, previously held that plaintiffs adequately alleged four material misstatements, each of which misled investors about the integration of Teladoc with Livongo, the historic deal merging the two companies. The District Court erred in its weighing of the inferences supporting Sienta, and specifically the inference of reckless disregard for the truth or falsity of the statements that conflicted not only with Second Circuit law and Novak v. Casex and many cases that came thereafter, but with this Court's prior opinion sustaining the four misstatements. The Court should reverse, find lost causation to be adequately pled, and allow this case to finally proceed to discovery. I'd like to start with the Sienta of CEO Gorevich, the maker of three of the four misstatements, and identify three clear errors that stand out and relate to, first, the District Court's misplaced emphasis on proof of his actual knowledge through smoking gun evidence, and refusal to consider whether those allegations supported his reckless disregard for the truth shown through access to information that contradicted the false statement as required by Setzer, Novak, and many other cases. Second, the Court's unsupported recasting of the risk factor misstatement in February 2022 that was designed to preclude consideration of certain Sienta allegations that were well-pled in the complaint. And third, the Court's isolated and over-weighted discounting altogether of insider trading allegations that at the very least should have increased plaintiff's pleading burden, should not have increased plaintiff's pleading burden. Can I ask you to start with the second? Because one of the things that I'm really struggling with is the prior decision in this case found the statement describing potential risks to be aware of involving integration as materially misleading because the risks, in fact, had come to pass. The problems with integration were a present reality. But as I'm trying to then take the next step and look at Sienta, and I think the District Court sort of struggled with this a little bit as well, integration is kind of a broad term. And in this case, we have integration of the sales force and marketing. We have integration of data sets. And we have integration of the products themselves to try to create a single one-stop-shopping product. When we're talking about the 10-K, what do you understand, which dimension of integration was the dimension with respect to which the 10-K was materially misleading? Thank you, Your Honor. There is a distinction, I understand, between the first three misstatements, which are these specific concrete facts, and the risk factor, which is broader. And we allege in the complaint that by that time, and this is what the Court held as opposed to the earlier risk statements, by February 2022, the integration, not just the integration of the sales teams and of Tableau and of sales force, there were many integration difficulties, including specifically product integration difficulties, that posed a threat to the company and its operations that had materialized. I think the Court before, this Court before, it left it somewhat open that there were allegations that there were significant materialization of various integration problems that led to those two later disclosures that led to over almost $10 billion of goodwill adjustments and continuing explanation of product integration issues and the like that had materialized at that time. So I think it shouldn't be so striated as the Court did, which Judge Cote below said, I'm going to limit it to sales team integration, Tableau, and sales force, and I'm only going to look at evidence related to those three. I think the simplest thing is very clearly, and most spelled out in the complaint, are the product integration issues. And by excluding product integration as one of the materialized and materializing risks that were only posed as hypothetical in the risk disclosure, the Court excluded certain pieces of information, including direct conversations with CEO Gorevich in September 2021 and the considerable weight of the CW allegations that said by this time, there were innumerable problems with the integration leading to problems for the company. But I think you could. But the risk disclosure was if we ultimately aren't able to integrate these, we could have problems. And the idea is, well, you're already having problems. What's the allegation that establishes the benchmark as to where they needed to be in the product integration relative to the 2022 disclosure that helps us determine that it was materially false, that that risk had materialized rather than it was in the process of materializing? I would start with respectfully that the law of the case is that it was materially false, and it was remanded to the Court. But I think you could. Well, no, do you think the law of the case is that as it relates to the extent of the product integration, the disclosure was materially misleading? I thought you just acknowledged that the panel decision before was a little bit open as to which dimension, or maybe it was all the dimensions. I don't know. I think respectfully it was all of the dimensions that led to this huge goodwill. But we try to focus in our complaint of one easily ascertainable, which was the product integration was definitely a risk that had materialized that was posed. So what are the allegations that tell us the benchmarks as to, like, where they had to be at that time in order to not have that risk have materialized already rather than being a forward-looking risk? I don't think it's forward-looking risk at all. The classic risk factor that was in Facebook and other cases, they presented as completely hypothetical. These are potential difficulties that we may encounter, and the complaint is full of allegations that at that time there were numerous difficulties that the company was facing, had faced, was continuing to face, and were about to cause huge losses for the company. So it's not a forward-looking statement. It's a hypothetical. If you've got a two-year-long project, I'm just making up a number, you've got a two-year-long project, you're going to have bumps along the way. You know that. It's a two-year-long project. There's going to be problems, and then it may ultimately all come together or it may not, and the risk is that it may not. And I'm trying to figure out, and I hear you saying there's a bunch of allegations. Just tell me the three allegations that are the most important from your perspective in showing sort of the ways in which the product integration at the time of that disclosure fell short of where it needed to be at that time, such that, because this is ultimately going to feed into the CNTR analysis, but I just need to understand what CNTR of what. Sure. I think the CNTR allegations regarding the product integration go from CW2 and CW4's discussion that as of September 2021, there's a senior leadership meeting where there are major concerns raised by senior leadership about the integration and the sales potential. And there's a conversation with CEO Gorevich, what's the plan? And he says stay tuned, and then presides, you know, that there's not a plan to integrate adequately all of the products, and they're not selling, and they admit in April, and I think you could look to their admissions later on in April and July, that the product integration has not gone smoothly, and it's still a lot of work to be done, and that's why they're taking, it's part of the reason they're taking these huge goodwill adjustments. So I think it's a little bit looking at what they've admitted are the problems later on, but also looking at the fact that you have multiple CWs from early 2021 through late 2021 saying, we have not integrated Tableau, we can't sell our products if we don't have this marketing platform that's actually integrated and able to sell these products together. You have the COO responding, I don't know, to what's the plan for integrating the sales team in the middle of 2021. The clear inference is if you haven't integrated the sales teams, if you haven't integrated the technology that's needed to merge these products and sell them to major hospitals, if you haven't integrated even your sales force platform to sell them, those are major indicia that there is not an integration, and the company is facing significant problems in actually fulfilling the promises of this merger. It's not able to integrate the companies, you're not able to make the joint product sales, you're not able to make the returns. Right, but there's a temporal dimension here that I'm really trying to sort of nail down. I mean, you can't integrate two big companies in all of these different dimensions overnight. And so I'm trying to figure out at what point the sort of challenges and problems of that kind of integration become a risk that has materialized and sort of what the allegations are that get us there. I mean, the same disclosure said that 78% of the sales were multi-product, right? That suggests that there's some commercial integration happening, that they're not just operating as two-sided companies, they're cross-selling. So that says to me, okay, that's an indicia of integration of some sort. Right, Your Honor. I can't give you a percentage of how much of the materialized risks had happened and had not happened as of this time. I feel the totality of the evidence in the complaint. In addition to the risk warnings, the panel did focus on the CEOs earlier, the February 2021 to April 2021 declaration of full integration. Correct, Your Honor. We're fully integrated. The commercial organization has been fully integrated. The sales teams, it's only across the entire whole person portfolio of products. So that was part of the – wasn't just the issue with the risk warnings, it was statements of full integration during the earnings calls, right? Correct, Your Honor. It's a somewhat easier – you only have four misstatements here because this Court did provide that guidance. And I think with regard to the risk factor, this Court, in its previous opinion, said as of February 2021, which is five to six months out, we're not going to say that they had to – these risks had fully materialized, that they were more than hypothetical. They found that there were specific statements at that point, that the sales team integration statements were alleged to be false and misleading. You were talking about the CEO, that when those statements were made of full integration, that he knew. Absolutely. And I'm glad you used the phrasing, he knew, because that is actually one of the main errors, I think, of the District Court's opinion. Of recklessly disregard. Right. The District Court, in her opinion, misstated what the standard is. And in Novak v. Kasich, it's an either or. You have to say, of all of these – and I just want to feel it's important because I feel it was a real error in her judgment and in the opinion – look at all the same allegations and find, either I'm going to find that this presents an inference that he knew or was reckless in disregarding the truth because he had access to information. So you're pointing to CW4? Yes, Your Honor. And I can go through CW4, the senior leadership member. This was after those February 2022 statements. But in September 2021, in the direct conversation at that time, months after those statements, Gorevic indicated that he was still working on and a plan was forthcoming and delivered a somewhat underwhelming plan for integration of those teams. I wasn't sure what – so underwhelming is – what does that give us? I mean, CW4 is not involved in the sales integration efforts, right? CW4 is a senior leadership. She's not involved in the sales efforts. And she – there's two parts to the conversation. There's the one that happened the day before where she says, what is the plan? Is there a plan? And he says, I'm going to tell you tomorrow. That's really the more salient part of the Sienter inference is that there had not been a plan pronounced and laid out by senior leadership in two senior leadership. That's the most compelling inference to be drawn. I'll tell you tomorrow when I tell the world? Well, when you're telling the world six months earlier that our sales teams are fully integrated. You have multiple – and it's not just CW4, Your Honor. You have multiple CWs, CW2, CW1, CW5, all of which were credited by this court in their prior opinion, saying there was no integration of the sales teams, not by February 2022, not by June 2021. But the questions that CW4 asked were just about integration generally, right? They weren't about sales integration. Correct, Your Honor. And it's one of the pieces – it's one of the inferences of Sienter. There has to be a weight. You have a scale. In some cases, you might have that scale. There's a brick, and it's totally weighted, all of the inferences. But you can get an inference. I was looking really for allegations. You have CW4, you have CW2, a sales vice president credited by this court, four different pieces of inferences there. But the issue is what is there to suggest that CW2's knowledge was delivered to Goralich? Sure. So what is there for that? To clarify, Your Honor, the answer is was it delivered to Goralich or did he have access to the information of the type that CW2 made available to others, like the COO and other direct reports to Goralich? In the late 2020 sales call involving Goralich that CW2 learned about and communicated, she said Goralich is making promises he can't keep about the integration of the products and sales. But what is the evidence that Goralich knew these were promises he couldn't keep? The information is she told that to the chief medical officer, Shaw, who works with Goralich, and he has access. It cannot be that as a CEO you can go out to the public and make a concrete, specific statement of fact that the market is desperate for. Our sales teams are fully integrated without either knowing the falsity or truth of that or making sure it's true. And he had plenty of access to information. He could have asked anyone. He could have asked his CEO. He could have asked, looked at the actual sales team numbers of whether there was integration. There was repeated town halls, according to CW2 and CW1, where Goralich fielded and largely ignored questions about integration difficulties. There were talking points memos throughout early 2021 of open issues for discussion that CW2 wrote and presented to HHS President DeVivo, Goralich's direct report revealing deep sales team disarray. And under Funko and Judge Lyman's opinion in Turquoise Hill, that kind of information to a direct report, courts may draw a strong inference that the CEO would have informed, the COO would have informed the CEO at leadership meetings of this deep disarray in the sales team. And there's also CW2's June 2021 question posed to COO sides in an open meeting attended by 30 to 40 employees, including DeVivo, about the elephant in the room, the lack of an integration plan. And when asked about the plan to integrate the RPM, which is one of the products of Livongo, he responded, I don't know. That's a great question. You also have CW5, who was responsible for integrating the sales teams, who confirmed that integration was still not complete by June 2021, months after Goralich's statement. So the weight of these allegations is substantial and is enough to sustain Sienta, although you don't have to stop there. But the standard is, did he know these statements were misleading, or was there sufficient information that he could have known to give him, to let him know whether this very concrete, specific statement about integration was true or not when he made it? And there's other indicia. You don't have to stop. Excuse me, Your Honor. With the CWs, you have, one, the specificity of the statement, and there are, that is important here. And thank you, Judge Bianco, for bringing that up. Because the first three misstatements were concrete and specific, and that does raise an inference of Sienta that you can't make those statements without either knowing the truth or falsity of them, or having access to and verifying the truth or falsity of them. You also have the Business Insider article, where a Teledocs spokesperson in November 2021 acknowledged that integration had been an issue during that post-acquisition period. And you do, and we're not saying the whole shebang here, but core operations and the magnitude of the falsity, is Livongo integration was Teledocs' most important strategic initiative. Sales team integration, no one disputes, was critical to driving the $500 million in targeted cross-selling revenue synergies, and it led to billions of dollars of goodwill impairment. So it does bolster it. And this Fort and Hain, too, acknowledged, you know, that is an important inference when you have something that's so important to investors, and talked about impacting the whole of the company, especially when you come to the specific statements, but I don't want to discount the risk factor. It's important, and it is an additional inference. And finally, you have the insider stock sales, where, you know, we've laid out in the brief why we think they were suspicious and unusual, and we're not saying it's all the weight in the world, but I think the way that the judge analyzed those insider trails independently didn't weigh them all together, which Hain and other courts have recently said, you have to look at these holistically, you have to add one on the other. She discounted them completely. And even if you accept that as fair, it does not create an additional burden on plaintiffs. It is one piece of the evidence. But we respectfully submit that $23.2 million in stock within one month of that April 21 statement, and $30 million of stock sales for Gorevic, which is 21.6 of his holdings, and $4 million of stock sales for Strait, which is over 40% of her holdings. You're giving the total number, but they acquired more than they sold, or these were all done with, you know, plans? They acquired more than they sold. That acquisition was through equity incentive awards, not through open market purchases, so it's a best-in-neutral. And basically there are 10B51 plans in place and tax purposes. That's routinely done, right? For some, but not all of the sales there were. And, Your Honor, I don't want to get too caught up in it, because I really do think that conscious misbehavior and recklessness is much more the weight of the evidence here. But I believe the way the court analyzed them, it created an extra burden or it created a negative inference or an innocent inference on behalf of the defendants, which is not justified. The only innocent inference that's been posited is, you know, it's a big integration, lots of things could go wrong. But that does not discount and does not counterweigh what this court has already found. These were four. A lot of the misstatements were kicked out by this court the first time, but these were four very important, specific, concrete statements, material to investors, that when the CEO or the chief marketing officer comes out and makes them to investors, they have a duty to know whether they are true or false and to access information. If they don't know, either don't say them or access that information and make sure, ask someone, is there full integration of the sales team? I think discovery will show a resounding no, and I think the allegations will hold up there, and I think the CEO was reckless, at least severely reckless, in making that statement, and the same goes for the CMEO regarding the Tableau integration. We've gone way over. I know. Thank you, Your Honor. We've got a couple of minutes for rebuttal, but I want to hear from Ms. Soloway. Good morning. May it please the Court, Audra Soloway for the defendants' appellees here. So pleading scienter in a securities fraud case is no small hurdle, and as we've just heard from the plaintiffs, they rely very heavily on their confidential witnesses to do so here. The district court very carefully reviewed those allegations, including CWs 2, 5, and 7, which were the CWs that this Court previously relied on to establish the adequacy of falsity, and the district court concluded correctly that those CW allegations simply did not plead, that the individual defendants here, the most senior executives of this company, were themselves aware of information that was inconsistent with their statements. What happened here, Your Honors, is that several CWs made personal observations based on their experience in the sales organization, that while sales teams had been integrated, because they admit, CWs 2 and 5 both admit that sales team integration had happened, that's in paragraphs 145, 148, and 212 of the complaint. Those are just some examples. What they said is, in their view, it hadn't been complete. And on that basis, the plaintiffs alleged falsity. But the problem now is that the plaintiffs have to establish that when Mr. Gorevic spoke about full integration, when in fact, in their view, it was only partial, that he knowingly or recklessly acted with intent to deceive shareholders. And unfortunately, the allegations, as they are actually written in the complaint, not as the plaintiffs describe them in their briefs or in argument, but as the allegations actually appear in the complaint, they simply do not demonstrate that the most senior executives of this health care company, undergoing a major transformative merger with thousands of employees, had knowledge of incompleteness or holes or gaps in the sales team organization. And in fact, here, the CWs themselves would be far better positioned to observe those types of gaps than the most senior management. And so falsity cannot be conflated with scienter in this case. Simply because falsity was pleaded does not mean that adequate allegations that the most senior executives had knowledge. It's hard. I find these scienter issues hard, though, because when we're talking about falsity relative to really important stuff, and we've got plausible allegations that the integration of the sales force was a hot mess, it starts getting hard to think that senior executives would either not know that or not be sort of charged with finding out about that before they start saying it to the public. And, I mean, it's one thing if he said something softer, but fully integrated seems like a fairly definitive statement. I think what Mr. Gorevic was talking about in the statement that remains is sales team integration, meaning you have, you know, your map of your organization at Livongo, you have your map of your organization at Teladoc. Who has the northeast region? Who has the south region? How are we going to combine these teams to make a united sales force? That is the thing that the CWs alleged. There were some holes in doing that. Someone said, I was siloed. I would not consider my team fully integrated. But Mr. Gorevic went on to say that other issues, product issues, technology issues, all the other things that have to happen in an acquisition and merger like this one were ongoing. And, in fact, there were risk disclosures about the challenges early on before they even started the process, and on a podcast a couple months into the class period, he said, we're doing this in the middle of the pandemic. I haven't even been in a room with a lot of these people. There are challenges. So I think we have to separate out what are the things that the plaintiff's CWs are actually reporting on and what does it mean to organize or to integrate the sales team. A lot of the CW allegations here are either about integration generally with no specified topic or they're about things like confusion about products. There's dozens of allegations in the complaint by CW2, for example, that there was this technology called remote patient monitoring, which she thought, how you define that and whether we have it was a topic that had come under confusion at the company. Okay, let's just assume that that's true. That doesn't mean the sales teams weren't integrated. So I think the problem here is that the plaintiffs are sort of using integration generally as a plug for integrating sales teams, which happened, and their CWs admit happened, and they're ignoring that their allegations, including the ones that my colleagues on the plaintiff's side just cited, don't actually talk about the sales team. They talk about other types of issues. And I want to be really specific here because I think if you actually look at some of these allegations, you can see that they're not really about sales team integration. So, for example, the plaintiffs have relied on CW2, excuse me, CW4, and this leadership team meeting in September of 2021. So at that meeting, Mr. Gorevic was allegedly asked an unspecified question about integration, not about the sales teams, about integration. I don't know what the question was, and he said, quote, wait until tomorrow. And then the next day, CW4 was, quote, underwhelmed by his presentation, and from that the plaintiffs are claiming that Mr. Gorevic was on knowledge of a sales team integration problem. That is not the level of particularity that would put, that would plead that Mr. Gorevic was actually on notice of this. Another, yes, Your Honor. Can I shift to the Spring 2210K? Sure. You could see with your colleague on the other side that I was, I'm trying to sort of grasp sort of measures of whether something is facing obstacles that are part and parcel of a complex integration or whether it's a risk that's materialized. And CW3 says with respect to the, I guess, the sales force technology integration, that when she left in the spring of 2022, that project had been expected to take 18 months, and 13 months were remaining when she left. That's significantly behind the sort of schedule that had been established. If that were true, would that be an example of a risk that had materialized and was no longer sort of something that might happen in the future because you're that far behind? No, Your Honor. I think the, I think you're referring to the sales force allegations? Yes. Is that your, so first of all, just to make sure the record is clear on this, in paragraph 302 of the complaint, 302C, there's an admission that as of October 2021, the company was in the process of rolling out a combined sales force platform. So just to be clear, sales force was being rolled out well before that February risk disclosure came out, which I think is a significant problem for the plaintiffs. But let's assume that sales force had gotten delayed and that there were some delays in rolling it out. There are no alleged false statements about sales force. The company did not come out and say, we have a particular timeline, sales force is going to be rolled out by this date, and we will consider ourselves unsuccessful if we don't make that happen. And then for some reason that materializes and it gets disclosed to the public and the stock drops. None of those things happened. The statements weren't made and no corrective disclosure was made. I think this sales force issue is really like a bit of a red herring, frankly. But the other problem I think is that this theory about risk disclosures, which the plaintiffs are relying on, the theory is that a statement is false because it's being presented as a hypothetical. But it also has to be true that the risk materialized in some way that then did harm to the company's business, and that when that became public, the stock price dropped. That also isn't present here with respect to sales force or even with respect to the so-called, you know, product issues that are really the focus of the vast majority of the complaint. Why did you – I'm curious why you put those in air quotes. The product issues? Yeah, I mean, that seems like it goes to the heart of what this is about. Is that an ambiguous term or something? No, I don't think that this case really is to the heart – I don't think the heart of this case is product issues, right? Okay. The plaintiffs originally pled this case with dozens of misstatements on multiple theories. One was a whole bunch of things about integration, and one was a whole bunch of things about competition. The competition theory is completely out of the case. It wasn't appealed. It's gone. And we're down to four alleged misstatements now about integration issues. Product integration is not – there's no statement in this case where the company said, by X date, we are going to have developed a platform where we're going to take this from Livongo, we're going to take this from Teladoc, and then they failed to actually make that happen, and they had to announce, we missed that deadline, and the stock price dropped. In fact, there's no product failure that is allegedly materializing in February of 2022 that is causing harm to the company's business. In our brief, we pointed out they don't point to what product that allegedly was supposed to be integrated that is actually causing harm to the business in February 2022 that materialized and caused the stock price to drop. And in their reply brief, the plaintiffs didn't fix the record on that, right? They have not told us what product allegedly was, you know, misrepresented, materialized, and then caused harm to the business. And I think this is very important. The plaintiffs are using the second – there's – as Your Honor knows, there's three alleged corrective disclosures here, the first being the Business Insider article that confirms that the sales teams were required to combine in January. But the second two were in this case because of the competition theory that has now been abandoned. So what happens is the company comes out and the company says, there has been increased competition in the marketplace, in particular with respect to the first disclosure for BetterHelp, a business, a mental health business that has nothing to do with this case. And they announce that and the stock price declines. These goodwill impairments that are related to these things have nothing to do – they're not disclosed to have anything to do with integration, and they don't even largely have anything to do with this particular issue. The second disclosure, and both of them have some additional disclosures about increased competition in the chronic care business. Again, increased competition meaning more entrance in the market, more competition with the company to sell products. That is not a disclosure of an integration-related failure, much less one that we had allegedly spoken about and had misrepresented. Does that answer your question, Your Honor? It did. Okay. I just want to make a couple more points. I fear I'm out of time, but just one more moment. The tact that the plaintiffs are taking also of attempting to plead scienter based on non-individual defendants, I would just encourage the Court to take a hard look at what those allegations actually are in the complaint and not as the plaintiffs describe them. I mean, these are the types of allegations, for example, with respect to Mr. DeVivo, who comes from a different business. He comes from the InTouch business, that CW2 claims to have drafted an open issues document in late 2020, so right after the closing, that asked questions about products, clients, and compensation. This open issues doc, as described in the plaintiff's own complaint, is hardly like a big revelation that there's been some failure. In fact, the document predates the first alleged misstatement. It doesn't specifically say anything about sales team integration. And I would think it would be normal that sales people are asking questions about products, clients, and their compensation plans. And that's in paragraphs 173 to 176 and 522. So this is just not the smoking gun document the plaintiffs make it out to be. And similarly, for Mr. Sides and Mr. Shah, I mean, with Mr. Sides, for example, he was asked a question, something generally about integration. He said, that's a great question. Okay. That's in paragraph 342 of the complaint. He was asked a question, allegedly, about remote patient monitoring, to which he said, I don't know. Okay. Neither of these questions puts Mr. Sides on notice that there was some failure to integrate the sales teams, much less puts Mr. Gorebick on notice of that. So, look, I think the district court got this exactly right. She said, first, these additional people, Mr. Sides, Mr. DeVivo, Mr. Shah, they're not even alleged to have been involved in disseminating the alleged misstatements. But in any event, the factual allegations tied to them just don't connect them to the subjects of the alleged false statements. And certainly for Mr. Gorebick and Ms. Verstraete, Ms. Verstraete is alleged to have made the misstatement about the marketing data and tech stacks. There is just no CW who has their many levels away from senior management. There is no CW who can actually say that Mr. Gorebick or Ms. Verstraete were aware of particular problems with sales team integration or Tableau. And in this case, I think when you weigh the inferences and you put them on that scale, and then you couple it with the fact that the individual defendants were out there, they put risk disclosures out there that this was going to be complicated, you know, they themselves were increasing their holdings of Teladoc stock. They were selling, actually every sale was pursuant to a Rule 10b-5-1 plan or for tax purposes. This is a fraud with absolutely no motive. It is senseless. And I think when you put all of this on the scale, the CW allegations, which are incredibly weak and just don't link senior management to knowledge inconsistent with their public statements, when you put this all on the scale, plainly the plaintiffs have not pleaded a compelling or strong inference of CIANTR. Thank you, Your Honors. All right. Thank you, Ms. Soloway. Ms. Wormsby for two minutes of rebuttal. Thank you, Your Honors. I'd like to turn to a few points that Ms. Soloway just made and to go back to one that Judge Robinson asked about the product integration. Paragraphs 132, I think, to 150, we do allege there was product. Sorry. It starts at 132, and I think it goes to about 155. There's a whole section about the failure to integrate the product platforms, and that involves the RPM product and other similar products. We do have allegations that these products were not fully integrated, they were not well integrated, and they were causing problems. And when there were the corrective disclosures later, the goodwill impairments, the company did not come out and admit this is because our Livongo integration is going poorly. But that is exactly how the market interpreted it. They were making also admissions during those corrective disclosures about needing to continue, that the product integration has a way to go. And on August 1st, after the last corrective disclosure, Credit Suisse said the company's products are just not fully integrated yet. So there is a connection between the failure to integrate these products and the product platforms which are necessary to sell the products to their customers and the corrective disclosures and to the risk factor disclosure itself. So the court did err in excluding completely that from her assessment of the CNTR allegations or the complaints allegations in total. I also want to go specifically just because she mentioned Ms. Fristrait. She was the Chief Marketing and Experience Officer, and we have CW Levin who is responsible for integrating the Tableau platform. We can see that there was no direct conversation between those two, but she is much in the same way we asked this court to analyze Mr. Gorovic's statements about full integration, concrete specific statements that this court has determined were alleged to be false with Ms. Fristrait going out as the Chief Marketing Officer and telling people that these platforms, our tech stacks, are fully integrated and we're on our way when they hadn't even begun to integrate the Tableau platform was a knowably false and misleading statement, even without a direct conversation between one specific CW and Ms. Fristrait. And CW Levin and CW Levin do provide ample evidence of her. You can make the inference of knowledge, but as we've emphasized, you don't need to. You can make the inference that there was a reckless disregard for the truth or falsity of that statement because both Mr. Gorovic in February and April and Ms. Fristrait in November certainly had access to the information that would allow them to know that those statements, which this court has sustained as actionably false, were false when made. If Your Honors have any other questions for me, I'd be happy to entertain them, but I know I overextended my time last time. I don't want to be at risk of that again. Okay. An interesting case and not a simple one. Great. Thank you both. Thank you all. We will reserve decision.